IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 19-cv-02781-RBJ

SU ZHOU, by and through her Power of Attorney, individually and on behalf of herself and all similarly situated persons,

     Plaintiff,

v.

SECURITY LIFE OF DENVER INSURANCE COMPANY, a Colorado corporation,

     Defendant.

---

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

---

This matter is before the Court on plaintiff's motion for partial summary judgment and defendant's motion for summary judgment. ECF Nos. 38, 40. For the reasons discussed below, plaintiff's motion is GRANTED, and defendant's motion is DENIED.

## I. FACTUAL BACKGROUND

The parties do not dispute the following facts. On August 27, 2015 Su Zhou ("plaintiff") applied for Security Life of Denver Insurance Company's ("defendant") universal life insurance policy. ECF No. 39 at 1. Plaintiff included a check in the amount of $6,000.00 with her application. ECF No. 39 at 1; ECF No. 39-2 at 2. This check cleared plaintiff's checking account on September 11, 2015. ECF No. 39-2 at 2. Upon receiving this check, defendant placed the funds in a suspense account on or about the same day. ECF No 40-2 at 14.

1

In addition to the application for the life insurance policy, plaintiff also submitted a Temporary Insurance Receipt ("TIR") to defendant.  *See* ECF No. 40-3.  The TIR listed the premium receipt as $6,000.00.  ECF No. 40-3 at 2.  The TIR provided life insurance coverage to plaintiff for ninety days or until the policy was in force, whichever came sooner.  *Id*.  Plaintiff also signed an "Acknowledgement in Lieu of Illustration Submission" and submitted the document with her initial application.  ECF No. 40-4.  These types of acknowledgements are "used during solicitation, when a policy applied for is different than as shown in the illustration used during solicitation."  ECF No. 40-4 at 2.  Under the acknowledgement, the premium amount was listed as "payable annually" for six years.  *Id.*

On October 8, 2015 defendant conditionally approved the policy.  ECF No. 40-5 at 1.  The conditional approval was contingent on the following three events: "(1) payment of $20,860; (2) a signed policy delivery receipt; and (3) a signed illustration correctly representing the applicant's purported planned funding strategy."  ECF No 40-2 at 14.  On October 23, 2015 plaintiff submitted another check in the amount of $22,000.00 to defendant, which was deducted from her checking account on November 3, 2015.  ECF No. 39 at 2; ECF No. 39-4 at 2.  These funds were also placed in defendant's suspense account.  ECF No. 40-2 at 14.  On November 9, 2015 plaintiff submitted a revised illustration, which defendant accepted as being in "good order."  *Id*.  Defendant accepted the application and placed the policy in force on November 12, 2015.  *Id.*  The policy contained a merger clause stating that the application was part of the policy.  The application contained a governing law provision that stated, "[t]he Policy shall be governed in all respects, including validity, interpretation, and effect, without regard to principles of conflicts of law, by the laws of the state in which it is delivered, which shall be deemed to be

the state in which this Application is executed as shown below." ECF No. 40-1 at 9. The application was executed in San Antonio, Texas. *Id.*

Although defendant did not receive and accept the required materials until November 12, 2015, the parties agreed to make the policy date October 8, 2015. ECF No. 1-1 at 3; ECF No. 40 at 13. Additionally, the policy defines "policy date" as "the date from which we measure policy years, policy months and policy anniversaries, and it determines the Monthly Processing Date." *Id.* at 24. The date the parties agree for the policy date—in this case, October 8, 2015—will also determine the policy's monthly processing dates.

Policyowners were given various strategy options, some of which permitted the policyowners to collect interest. Plaintiff's policy fell under the fixed strategy option, which permitted the policyowner "to have all or part of [their] Account Value earn interest at a rate declared by [defendant] subject to the guaranteed minimum interest rate." *Id.* at 23. The guaranteed minimum interest rate was two percent per year. *Id.* at 13. From October 8, 2015 through October 7, 2016 defendant's declared interest rate was 4.25 percent. ECF No. 1-2 at 3.

The policy provides a formula for how the fixed strategy amount will be calculated. Additionally, it lists how interest is to be credited on both the policy date and each subsequent monthly processing date. I refer to this part of the contract as the "interest-crediting provision." This portion of the contract reads,

> On the policy date, the value of the Fixed Strategy is the Net Premium paid on that date, minus the Monthly Deduction for the first policy month. On any Monthly Processing Date other than the Policy Date, the value of the Fixed Strategy equals:
>
> a. The value of the fixed strategy on the first day of the previous policy month; plus
> b. One month's interest on the value of the Fixed Strategy as of the first day of the previous policy month

3

c.   Any Net Premium received since the most recent Monthly Processing Date with interest from the date of receipt to the date of calculation; plus

d.   Any amounts added to the Fixed Strategy since the most recent Monthly Processing Date with interest from the effective date of the transaction to the date of calculation; minus

e.   Any amounts added to the Indexed Strategy or Policy Loan Account, if applicable, since the most recent Monthly Processing Date with interest from the effective date of the transaction to the date of calculation; minus

f.   The Monthly Deduction subtracted from the Fixed Strategy for the current month; minus

g.   The amount of any partial withdrawal subtracted from the Fixed Strategy on the current Monthly Processing Date and the service fee for such partial withdrawal; minus

h.   Any policy or rider transaction charges subtracted from the Fixed Strategy since the most recent Monthly Processing Date with interest from the effective date of the transaction to the date of calculation; minus

i.   Any surrender charges subtracted from the Fixed Strategy since the most recent Monthly Processing Date with interest the effective date of the transaction to the date of calculation.

ECF No. 1-1 at 33.

As mentioned above, plaintiff made her first premium payment on August 27, 2015 in the amount of $6,000.00.  ECF No. 39 at 1.  The check cleared plaintiff's bank account on or about September 11, 2015, and defendant placed it into a suspense account upon receipt.  ECF No. 40 at 3.  Plaintiff paid her next premium in the amount of $22,000, which cleared her account on November 2, 2015.  Those funds were also placed in a suspense account.  ECF No. 40-2 at 14. The funds placed into the suspense account were not credited to the policy until November 12, 2015, the date defendant received all outstanding documents and considered the policy to be finalized.  *Id*.

In October 2016 defendant issued plaintiff her first annual statement outlining her policy's performance through October 7, 2016.  *See* ECF No. 38-2.  The policy statement lists no activity until December 8, 2015, two months after the policy date.  *Id*. at 5.  According to the

4

annual statement, no premium payments were made as of the October 8, 2015 or November 8, 2015 monthly processing dates. *Id*. at 4.  The statement also shows that no administrative fees were charged, nor was any interest paid, for either the October or November dates. *Id.*  The account value is listed as $0.00 for both processing dates. *Id*.

December 8, 2015 is the first monthly processing date that shows any activity on the account. *Id*.  The statement lists the following activity: $28,000 in premium fees, $4,822.42 in administrative charges, $60.00 in policy charges, $213.97 in cost of insurance charges, $447.26 in rider charges, and $69.39 in credited interest and index credits.  The overall account value is listed as $22,525.74. *Id*.  On the January 8, 2016 monthly processing date, the following activity is listed: $674.14 for administrative charges, $20.00 for policy charges, $71.45 for cost of insurance charges, and 149.35 for rider charges. *Id.*  Therefore, the December 8, 2015 charges were about three times higher than the subsequent monthly charges.  Defendant did not credit plaintiff's account with any interest for the payments received prior to November 12, 2015.

## II. PROCEDURAL BACKGROUND

Plaintiff filed this case on September 27, 2019.  ECF No. 1.  In her complaint, plaintiff named two defendants: Security Life of Denver Insurance Company and Voya Financial, Inc. ECF No. 1.  Plaintiff, individually and on behalf of a putative class, brought a single breach of contract claim against defendants. *Id*.  Defendants filed their initial answer on December 3, 2019 and an amended answer on January 17, 2020.  ECF Nos. 13, 27.  On March 25, 2020 the Court dismissed Voya Financial, Inc. as a party, leaving SLD as the sole defendant in this case.  ECF Nos. 33, 34.

On August 21, 2020 plaintiff filed a motion for partial judgment, and defendant filed a motion for summary judgment.  ECF Nos. 38, 40.  Plaintiff filed its brief in opposition to defendant's motion on September 4, 2020.  Defendant responded to plaintiff's motion on that same day.  On September 25, 2020 an oral argument was held telephonically, and the parties argued their positions.  ECF No. 44.  The matter is now ripe for review.

### III. STANDARD OF REVIEW

A court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id*. at 324.  A fact is material "if under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  The court will examine the factual record and make reasonable inferences in the light most favorable to the party opposing summary judgment.  *See Concrete Works of Colo., Inc. v. City and Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

When parties file cross motions for summary judgment, the court is entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts.  *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Fed. Ins. Co.*, 213 F. Supp. 3d 1333, 1339 (D. Colo.

2016), *aff'd*, 734 F. App'x 586 (10th Cir. 2018) (unpublished).  Furthermore, "the reasonable inferences drawn from affidavits, attached exhibits, and depositions are rendered in the light most favorable to the non-prevailing party."  *Id.*  (citing *Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004)).

## IV. ANALYSIS

The parties disagree on what issue is before the Court and on what law should apply. Plaintiff argues that the issue is one of contract interpretation, while defendant argues it is one of contract formation.  According to plaintiff, defendant breached the policy's interest-crediting provision when it failed to credit plaintiff's account with interest on either the October 8, 2015 policy date or November 8, 2015 monthly processing date.  ECF No. 38.  Defendant argues that it could not have possibly breached the contract because there was no valid, enforceable contract as of these dates.  *See* ECF Nos. 40, 42.  Plaintiff argues Colorado law should apply, while defendant argues Texas law should apply.  I must first determine which state's law applies before turning to the specific issues arising under the policy.

### A.  <u>Whether Colorado or Texas Substantive Law Should Govern</u>

Federal courts sitting in diversity jurisdiction apply the choice of law rules of their forum states.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 796 (1941).  While this Court has jurisdiction under the Class Action Fairness Act, that act is recognized as "expanding federal diversity jurisdiction over interstate class actions."  *Speed v. JMA Energy Co., LLC*, 872 F.3d 1122, 1126 (10th Cir. 2017).  Accordingly, this Court must apply Colorado's choice-of-law rules to determine which state's substantive law should apply.

7

Colorado follows the Restatement (Second) of Conflict of Laws (1971) for contract actions. *See Kipling v. State Farm Mut. Auto. Ins. Co.*, 774 F.3d 1306, 1310 (10th Cir. 2014) (citing *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau*, 601 P.2d 1369, 1372 (Colo. 1979)). When analyzing what law to apply to a contract claim, the Restatement first directs the court to consider any choice-of-law provision in the contract. Restatement § 187. Colorado courts, consistent with the Restatement, state that ". . . we will apply the law chosen by the parties unless there is no reasonable basis for their choice or unless applying the chosen state's law would be contrary to the fundamental policy of the state whose law would otherwise govern." *Target Corp. v. Prestige Maintenance USA, Ltd.*, 351 P.3d 493, 497 (Colo. App. 2013). The primary reason courts enforce choice-of-law provisions is "to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract." Restatement (Second) of Conflict of Laws § 187 (1971).

Here, there is a reasonable basis for choosing Texas law because plaintiff lived in Texas and executed the contract there. Plaintiff does not suggest that applying Texas law would be contrary to any fundamental policy of Colorado. Even though plaintiff contends that the outcome would not be different under Colorado or Texas law, enforcing the governing law provision would protect the parties' expectations. Plaintiff argues that the Court should not enforce the governing law provision because (1) Texas and Colorado substantive law does not differ on any issue before the Court, and (2) because courts encourage a uniform interpretation of standardized insurance contracts. I address each of plaintiff's arguments in turn.

### 1.   Plaintiff's Outcome-Determinative Argument

Plaintiff contends that this Court need not engage in a choice-of-law analysis—and should instead apply the forum state's law—because neither state's law would produce a different outcome on the issue before the Court.[1]  In making this argument, plaintiff relies on two District of Colorado cases.  The first is *United Intern Holdings, Inc. v. Wharf*, where the court stated, "[u]nless [an outcome-determinative] conflict exists, courts do not make choice of law decisions."  946 F. Supp. 861, 866 (D. Colo. 1996).  The second is *WTI Partners v. Ahn*, where the court did not conduct a choice-of-law inquiry because neither state's law would result in a different outcome on any issue.  No. 18-CV-02269-MEH, 2020 WL 3259067, at *5 (D. Colo. June 16, 2020).

However, unlike the policy at issue in this case, the underlying contracts in the cases relied on by plaintiff did not contain enforceable choice-of-law provisions.  In *United Intern. Holdings,* the documents that contained purported choice-of-law clauses were unsigned.  On appeal, the Tenth Circuit held that these "documents are virtually irrelevant in their unsigned form and are insufficient to constitute binding forum selection and choice of law provisions.  'To be mandatory, a clause must contain language that clearly designates a forum as the exclusive one." *United Intern. Holdings v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1223 (10th Cir. 2000).  Second, in *WTI Partners*, there was no governing-law provision in the contract, nor did either party request that the Court apply the substantive law of a certain state.  There, the court stated

---

[1] Notably, while defendant admits that the elements necessary to form a valid contract in each state are the same, defendant points to a Texas law that requires policyowners to receive a valid illustration prior to a policy being enforceable.  ECF No. 40 at 8.  However, in Part IV.B, I find that when the contract was formed is irrelevant for the purposes of deciding these cross-motions.

that "neither party addresses the applicable law to this case." *WTI Partners*, 2020 WL 3259067 at *5. The court went on to say "[d]efendants provide citations to California law but note that the outcome under either Colorado or California law should be the same. However, Defendants do not explain why California law should necessarily apply." *Id.*

Based on the above facts, these two cases are distinguishable. Unlike *United Intern. Holdings*, the policy's application—which merged into the policy through the policy's merger clause—contained a governing law provision and was signed. Furthermore, unlike *WTI Partners*, defendants specifically requested that this Court apply Texas law and enforce the policy's governing law provision. Therefore, the existence or enforceability of the governing law provision is not in dispute.

### 2. The Standardized Contract Issue

Plaintiff next argues that Colorado law should apply because the terms of standardized contracts "ought not vary depending upon the residence of a given policyowner." ECF No. 43 at 6. Plaintiff cites numerous cases to support her position. However, none of these cases is on point, none is binding on this Court, and all of the cited cases involve issues arising at the class certification stage, a stage both parties agreed to postpone until the Court resolved the dispositive motions. ECF No. 44. For efficiency's sake, I address only some of plaintiff's cited cases.

Plaintiff first relies on *Gillis v. Respond Power, LLC,* a Third Circuit case, where an energy company used a standard form contract containing the provision, ". . . Respond Power's goal each and every month is to deliver your power to a price that is less than what you would have paid had your [sic] purchased your power from your local utility company . . . . Respond cannot always guarantee that you will see savings." 677 F. App'x 752, 754 (3d Cir. 2017)

(unpublished).  In *Gillis*, the trial court declined to certify a class after finding that members of the putative class interpreted the provision differently.  *Id*. at 755.  The appellate court reversed and held that "[i]n the context of standard form contracts . . . extrinsic evidence of individual understandings is especially irrelevant.  Individual signatories to such contracts understand that they have no bargaining power to specific terms, and they expect to be treated like all other signatories to the form document."  *Id*. at 756.

Plaintiff next cites to *Robin Drug Co. v. PharmaCare Mgmt. Servs. Inc.* a District of Minnesota case, involving class certification where the defendant used a standard contract in its negotiations and dealing with various pharmacies.  No. Civ.03397(PAM/RLE), 2004 WL 1088330 (D. Minn. 2004).  There, the defendant argued against class certification by asserting "each [putative class member] must prove its agreement with PharmaCare by reference to its subjective state of mind at the time of the contract."  *Id*. at *4.  The principle question before the court was "whether PharmaCare's defense of waiver requires a separate determination on each class member's knowledge."  *Id*. at *5.  Plaintiff also cites to *Peoples v. Sebring Capital*, where under similar circumstances, the court rejected "the broader notion that it will generally have to examine the parties' intent on a transaction-by-transaction basis."  No. 01 C 5676, 2002 WL 406979, at *8 (N.D. Ill. 2002).  The *Peoples* court relied on § 211(2) of the Restatement (Second) of Contracts which states that standardized agreements are "interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of writing."  *Id*.

In addition to not being binding on this court, the above cases are distinguishable both procedurally and factually.  First, they all involve whether the putative class meets the

certification requirements—an issue that is not yet before the Court.  Second, the cases are factually distinguishable because the Court need not determine anyone's knowledge or understanding of the provision at issue in this case.  That provision reads, "[t]he Policy shall be governed in all respects, including validity, interpretation and effect, without regard to principles of conflicts of law, by the laws of the state in which it is delivered, which shall be deemed to be the state in which this application is executed as shown below."  ECF No. 40-1 at 9.  Rather than ascertaining the parties' knowledge or understanding, the Court must only determine where plaintiff signed the application.  Fortunately, the application asks the applicant to indicate where it was signed.  In this case, Ms. Zhou signed the application in San Antonio, Texas.  *Id.*  Thus, because the Court need not determine the individual parties' knowledge, the policy's standardized nature does not preclude this court from enforcing the governing law provision.

Plaintiff's arguments for why the Court should not enforce the policy's governing law provision are therefore unavailing.  I find that the governing law provision is enforceable, and that Texas law applies.

### B.  Whether this is a Case about Contract Formation or Contract Interpretation

The parties disagree over what issue the Court must decide.  Plaintiff argues the issue before the court is one of contract interpretation, while defendant argues it is one of contract formation.  *See* ECF Nos. 40, 43.  Plaintiff alleges that defendant breached the contract when it failed to credit plaintiff's account with interest from October 8, 2015, the parties' agreed upon policy date, and November 8, 2015, the first monthly processing date.  *See* ECF Nos. 1, 38.  To support this claim, plaintiff argues that the interest-crediting provision—which keys the payment of interest to the policy date—is unambiguous, and that the Court must enforce its plain

meaning.  ECF No. 38 at 2.  Defendant argues that no contract was formed until November 12, 2015, and that it had no duty to credit plaintiff's account with interest until December 8, 2015, the first monthly processing date after the contract was "in force."  I begin with defendant's argument.

1. When Did the Policy become a Valid, Enforceable Contract?

Defendant characterizes the central dispositive question in this case as "when did the Policy become a valid and enforceable contract?"  ECF No. 40 at 5.  Defendant argues that the contract was not enforceable until November 12, 2015, and that it was therefore not required to credit plaintiff's account with interest until that date.  *Id.*  Plaintiff admits that "by at least November 12, 2015, the parties had entered an enforceable policy contract in which they agreed to use a policy date of October 8, 2015."  ECF No. 42 at 2.

Defendant lists numerous reasons why there was no valid contract until November 12, 2015, including: (1) plaintiff was bound by another temporary insurance contract up until November 12, 2015; (2) the application stated that it would be conditionally approved "subject to certain outstanding requirements that Ms. Zhou still needed to complete to SLD's satisfaction;" (3) the conditional approval constitutes a counter-offer and not an acceptance; and (4) the policy date is not synonymous with the "in force" date.  *See* ECF Nos. 40, 42.  Plaintiff argues that all of these points are red herrings because "when the contract is formed does not determine the period for which interest is required to be paid . . . by the express provisions of the as-formed contract."  ECF No. 43 at 1.  I agree.

Whether the contract was formed on or before November 12, 2015 is irrelevant.  For the purposes of these cross-motions, I assume that the contract was formed, as defendant contends,

on November 12, 2015.  Taking that piece of information as true, the central question is not—as

defendant argues—on what date the contract was formed.  Instead, the question this Court must

answer is whether, under Texas law, contracting parties may backdate a contract's effective date.

Put another way, the issue before the Court is whether the parties' contract rights and

obligations, including defendant's obligation to pay interest, became effective on a date prior to

the day the contract was deemed final and enforceable.

> a.   Texas Law on Applying Contracts Retroactively

There is admittedly little caselaw on whether a party's obligations under a contract

retroactively apply before the date the contract was formed.  Plaintiff addresses the issue by

citing mostly to Colorado law, which I determined does not apply in Part IV.A.2 of this order.

Defendants do not address the issue of whether a contract can be retroactively enforceable.

Texas law permits parties to backdate their contract's effective date.  In *Gulf Oil Corp v.*

*Spence & Howe Const.* the court stated, "[w]e see no reason why a contract may not be made

retroactive where the parties choose to do so."  356 S.W.2d 382, 386 (Tex. Civ. App. 1962),

*aff'd*, 365 S.W.2d 631 (Tex. 1963).  Another Texas Court, relying on *Gulf Oil Corp.*, stated,

"[w]hile parties can choose to apply a contract retroactively . . . this intent is not evident [here].

*ALCOA v. Hydrochem Indus. Services, Inc.*, No. 13-02-00531-CV, 2005 WL 608232 at *4 (Tex.

App. 2005).  In the assignment context, another Texas court wrote, "[a]lthough assignments are

usually effective on the date on which they are signed, nothing in the Home Equity Deed of Trust

requires that any assignment be effective only upon execution.  Therefore, [the parties] were not

precluded from executing an assignment with a retroactive effective date."  *Crowell v. Bexar*

*County*, 352 S.W. 3d 114, 117 (Tex. Ct. App. 2011).  Finally, another court, relying on *Crowell*,

held that assignments may be backdated.  "At least two Texas Court of Appeals have considered this very question, and both have held that an assignment may have a retroactive effective date." *Deutsche Bank National Trust Company v. Burke*, 655 Fed. Appx 251, 254 (5th Cir. 2016).

While the issue does not arise regularly in Texas courts, I find that parties may backdate a contract's effective date under Texas law so long as nothing in the contract precludes such retroactivity.  I therefore must interpret the policy's terms to determine whether the provision at issue—the interest-crediting provision—may be retroactively applied to the October 8, 2015 policy date.

### b. Contract Interpretation Principles under Texas Law

Insurance policies are construed and interpreted in accordance with the standard rules of contract interpretation.  *Tanner v. Nationwide Mut. Fire. Ins. Co.*, 289 S.W 3d 828, 831 (Tex. 2009).  When interpreting contracts, the court's "cardinal concern is determining the parties' intent as reflected in the terms of the policy itself."  *Id*.  Courts must "give effect to the parties' intentions as expressed in the document."  *Lopez v. Munoz, Hockema, & Reed, LLP*, 22 S.W.3d 857, 861 (Tex. 2000).  The contract's objective terms should control rather than the parties' subjective interpretations.  *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763–64 (Tex. 2018).

"Whether a contract is ambiguous is a question of law for the court to decide."  *Lopez*, 22 S.W.3d at 861 (citing *R&P Enters. V. LaGuarta, Gavrel & Kirk, Inc.*¸ 496 S.W.2d 517, 518 (Tex. 1980)).  A contractual term is unambiguous "if it can be given a definite or certain meaning as a matter of law."  *Columbia Gas Transmission Corp. v. New Ulm Gas*, *Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) (citing *National Union Fire Insurance Co. v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)).  Parties may not introduce extraneous evidence to create an

15

ambiguity. *CBI Industries*, 907 S.W.2d 517, 520.  Furthermore, an ambiguity does not exist

merely because parties disagree over a contract term. *URI, Inc.*, 543 S.W.3d at 763.  An

ambiguity exists only when "the language of the policy or contract is subject to two or more

reasonable interpretations. . . ." *CBI Industries*, 907 S.W.2d at 520.

      c. <u>Interpreting the Policy</u>

Texas law requires the Court to (1) give effect to the parties' intentions as expressed in

the document, and (2) determine whether the policy's language is subject to more than one

reasonable interpretation.

Prior to analyzing the policy, the Court briefly summarizes the parties' positions.  The

parties agree that the policy date is October 8, 2015 and that the policy date determines

subsequent monthly processing dates.  They further agree that the monthly processing dates

under the policy fall on the eighth day of each month.  Plaintiff argues that the policy's language

required defendant to credit plaintiff's account with interest as of the policy date.  Defendant

argues that the contract was not finalized until November 12, 2015 and that its interest-crediting

obligations did not arise until December 8, 2015, the first monthly processing date after

defendant deemed the policy finalized.  While defendant claims that its interest-crediting

obligations under the policy were not triggered until November 12, 2015, defendant puzzlingly

states that plaintiff's obligations are governed by the October 8, 2015 policy date.  Thus, the

primary question the Court must determine is when defendant's contractual duty to pay interest

arose.

i. The Interest-Crediting Provision

16

The policy's interest-crediting provision outlines how SLD will calculate interest to plaintiff's account.  *See* ECF No. 1-1 at 33.  The relevant text is:

> On the policy date, the value of the Fixed Strategy is the Net Premium paid on that date, minus the Monthly Deduction for the first policy month.  On any Monthly Processing Date other than the Policy Date, the value of the Fixed Strategy equals:
>
> a.  The value of the fixed strategy on the first day of the previous policy month; plus
> b.  One month's interest on the value of the Fixed Strategy as of the first day of the previous policy month
> c.  Any Net Premium received since the most recent Monthly Processing Date with interest from the date of receipt to the date of calculation; plus
> d.  Any amounts added to the Fixed Strategy since the most recent Monthly Processing Date with interest from the effective date of the transaction to the date of calculation; minus
> e.  Any amounts added to the Indexed Strategy or Policy Loan Account, if applicable, since the most recent Monthly Processing Date with interest from the effective date of the transaction to the date of calculation; minus
> f.  The Monthly Deduction subtracted from the Fixed Strategy for the current month; minus
> g.  The amount of any partial withdrawal subtracted from the Fixed Strategy on the current Monthly Processing Date and the service fee for such partial withdrawal; minus
> h.  Any policy or rider transaction charges subtracted from the Fixed Strategy since the most recent Monthly Processing Date with interest from the effective date of the transaction to the date of calculation; minus
> i.  Any surrender charges subtracted from the Fixed Strategy since the most recent Monthly Processing Date with interest the effective date of the transaction to the date of calculation.

ECF No. 1-1 at 33.

The policy defines many of the above terms.  The fixed strategy is "a strategy available under the policy through which you may elect to have all or part of your account value earn interest . . . ."  ECF No. 1-1 at 23.  The account value is the sum of the fixed strategy, the indexed strategy, plus the policy loan account.  *Id*.  The net premium is "the premium received minus the premium expense charges."  *Id*.  The policy date is "the date from which we measure

policy years . . . it determines the Monthly Processing Date." *Id*. Finally, the monthly processing date is the date "on which the Monthly Deduction from the Account Value is due."

Keeping these terms and their definitions in mind, I briefly summarize the interest-crediting provision. Under the fixed strategy option, a policyowner pays a large premium up front in exchange for the right to earn interest. That large premium is factored into the calculation of the fixed strategy value. SLD then credits interest on the fixed strategy value each month. The calculation for determining the fixed strategy value differs depending on whether the value is being calculated on the policy date or on a subsequent monthly processing date. On the agreed upon policy date—in this case, October 8, 2015—the value of the fixed strategy is any premium the plaintiff has paid on that date minus any monthly charges. Generally speaking, on subsequent monthly processing dates the value of the fixed strategy is the prior month's value plus any interest accrued during the previous policy month.

Plaintiff argues that defendant was contractually obligated to credit plaintiff's funds with interest as of the October 8, 2015 policy date. ECF No. 38 at 7. Specifically, plaintiff argues that (1) interest on the net premium for the $6,000 check that cleared Ms. Zhou's account on September 11, 2015 "should have been calculated using the October 8, 2015 Policy Date stated in Plaintiff's policy," and (2) interest on the net premium for the $22,000 check should have been credited with a date no later than November 3, 2015, the day on which it cleared plaintiff's account. *Id*. Defendant argues their duty to credit interest did not arise until December 8, 2015, the first monthly processing date after November 12, 2015, the date the contract was formed. ECF No. 40 at 2. Defendant encourages this Court to look holistically at the policy—as the Court is required to do—and accuses plaintiff of cherry-picking clauses favorable to plaintiff's

interpretation, while ignoring those favorable to defendants.  ECF No. 42 at 2.  However, when viewing the policy holistically, I find that it is defendant, not plaintiff, who cherry picks terms.

Defendant's argument is unreasonable upon considering the first sentence under the "Fixed Strategy Values" on page fifteen of the policy.  That sentence reads, "[o]n the Policy Date, the value of the Fixed Strategy is the Net Premium paid on that date, minus the Monthly Deduction for the first policy month."  ECF No. 1-1 at 33.  *Id.*  Put differently, on the policy date—here, October 8, 2015—the value of the fixed strategy is the difference between any net premiums received and the monthly deductions.  As of October 8, 2015, Ms. Zhou paid $6,000 in premium fees.  Despite the $6,000 check that cleared Ms. Zhou's checking account in September 2015, defendant did not list any premium being received as of October 8, 2015.  *See* ECF No. 38-2.  Defendant thus did not calculate the fixed strategy value according to the formula provided in the policy.

Defendant argues that it could not treat Ms. Zhou's $6,000 as a net premium on October 8, 2015 because a net premium could not exist prior to contract formation.  ECF No. 42 at 11. However, no language in the contract supports such a reading.  According to the contract, drafted by SLD, the fixed strategy value (1) is initially calculated on the policy date; and (2) must include any net premium received as of that date.  Therefore, on October 8, 2015 plaintiff's fixed strategy value should have included her $6,000 premium payment.  Defendant did not start paying interest on plaintiff's $6,000 premium until November 12, 2015, a month after its performance was due.

Defendant's hypocritical reading of the policy casts further doubt on the argument that defendant's obligations did not extend back to the October 8, 2015 policy date.  Defendant

argues its obligations under the contract did not reach back to the policy date because there was no enforceable contract as of that date. However, defendant then argues that plaintiff's obligations reach back to the October 8, 2015 policy date. On December 8, 2015 defendant charged plaintiff three times the usual amount for administrative charges, policy charges, cost of insurance charges, and rider charges. ECF No. 38-2 at 6. However, defendant only credited plaintiff's account with twenty-six days' worth of interest on that date. Defendant's interpretation produces an unreasonable result that is not supported by the policy's plain language. Under defendant's interpretation, plaintiff is required to retroactively perform under the contract, but defendant is not. Here, the policy's plain language shows that the parties intended for both of their respective rights and obligations to be triggered as of the October 8, 2015 policy date.

Defendant next relies on subsection "c" of the fixed strategy formula to argue that its interest-crediting obligations did not begin until November 12, 2015. Under that provision, on every monthly processing date "[a]ny Net Premium received *since the most recent Monthly Processing Date* with interest from the date of receipt to the date of calculation . . . ." must be added to the fixed strategy value. ECF No. 1-1 at 33 (emphasis added). Defendant argues that because no contract was formed until November 12, 2015, the first monthly processing date on which it had an obligation to pay interest was December 8, 2015. However, the contract could not be clearer on how monthly processing dates are determined. They are determined by the policy date, which is an agreed upon date by the parties. Here, the parties agreed to a policy date of October 8, 2015. Therefore, the first monthly processing date would be November 8, 2015.

As of November 8, 2015, defendant had received two premium payments from plaintiff. The first was the $6,000 premium that cleared plaintiff's account on September 11, 2015. The second is the $22,000 premium that cleared plaintiff's account on November 3, 2015. I have already found that, according to the terms of the policy, the $6,000 premium should have been added to the fixed strategy value as of the October 8, 2015 policy date. However, based on subsection "c" of the fixed strategy formula, interest is to be paid from the date the premium is received to the date of calculation. Therefore, under the terms of the policy, interest should have been accruing on the $22,000 premium as of November 3, 2015, the date it was received. Defendant should have credited that interest to plaintiff's account on the November 8, 2015 processing date, the date of calculation.

Defendant ignores subsection "h" of the fixed strategy formula which contains the same "received since the most recent Monthly Processing Date" language. That section states that defendant will deduct "[a]ny policy or rider transaction charges from the Fixed Strategy *since the most recent Monthly Processing Date* . . . ." *Id.* When discussing subsection "c" defendant argues that retroactively crediting interest does not make sense "in light of the phrase 'received since the most recent Monthly Processing Date." ECF No. 42 at 11. However, defendant construes that same phrase to permit retroactivity when it involves plaintiff's obligations under the policy. On December 8, 2015, SLD did not charge plaintiff one month of deductions. Instead, SLD charged three months of deductions by retroactively charging plaintiff according to the October 8, 2015 policy date.

At oral argument the Court asked defendant's counsel how SLD could justify a policy interpretation that permitted plaintiff to be charged retroactively but precluded defendant from

having to credit interest retroactively.  Defendant primarily argued that Ms. Zhou had the option to change her policy date prior to the contract being in force.  ECF No. 44.  This did not answer the Court's question.  However, defendant repeatedly makes this argument in both defendant's motion for summary judgment and in defendant's response to plaintiff's motion, so I address it briefly.

According to defendant, plaintiff had the option to backdate her policy date so that she could potentially reduce her insurance age.  ECF No. 42 at 13.  The Court finds this argument irrelevant because plaintiff did not choose to backdate her policy.  However, even assuming that she had, this would not have affected defendant's interest-crediting obligations.  Even if plaintiff backdated her policy, defendant would still have received the checks at the same time.  Here, defendant received the premiums and held onto them for several weeks before allowing the funds to accumulate interest.  If plaintiff had backdated her policy to a date before defendant had these checks, there would be no funds on which to credit interest.  In other words, plaintiff's "fixed strategy" on the policy date would be zero because no net premium would have been paid by that earlier date.

Therefore, even relying on defendant's argument that no contract was formed until November 12, 2015, defendant's interpretation is not reasonable.  Under such an interpretation, defendant would have this Court apply only certain portions of the policy retroactively, namely only the portions benefitting SLD.  Such an interpretation defies both the plain language of the contract and the parties' agreement to make October 8, 2015 the policy date.  According to the policy, defendant had an obligation to (1) add the $6,000 premium payment to the fixed strategy value as of the October 8, 2015 premium date, and (2) add the $22,000 premium payment to the

fixed strategy value as of the November 8, 2015 monthly processing date.  Notably, even if the Court found that the policy language were ambiguous, basic concepts of contract interpretation would require the Court to construe any ambiguous provisions against the drafter; i.e., against SLD.  For these reasons, defendant's motion for summary judgment is DENIED, and plaintiff's motion for summary judgment is GRANTED.

**ORDER**

1. Plaintiff's motion for partial summary judgment, ECF No. 38, is GRANTED.

2. Defendant's motion for summary judgment, ECF No. 40, is DENIED.

DATED this 14th day of December, 2020.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge